IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OWL CYBER DEFENSE SOLUTIONS, LLC,
   *Plaintiff*,

v.

KPAUL PROPERTIES, LLC,
   *Defendant*

Civil Action No.
23-CV-2391-ABA

**MEMORANDUM OPINION**

This case arises out of a contract dispute between Plaintiff Owl Cyber Defense, Inc. ("Owl"), a network security company in Maryland, and Defendant KPaul Properties, LLC ("KPaul"), an Indiana-based federal contractor. Owl has moved for summary judgment, alleging that KPaul breached the parties' written agreement by failing to pay for the products and services that Owl provided to KPaul's end-customer, the United States Army (the "Army"). ECF No. 26 ("Mot."). No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). Having considered Owl's motion, KPaul's opposition, ECF No. 28 ("Opp."), and Owl's reply, ECF No. 30 ("Pl. Reply"), the motion will be granted in part and denied in part, for the following reasons.

**BACKGROUND**[1]

In early 2021, KPaul decided to submit a bid for a government contract related to an Army defense initiative. To do so, it needed to procure certain software and hardware and other services that Owl was in a position to provide, and thus KPaul requested that Owl provide a quote. *See* ECF No. 26-1 at 2-3. Owl sent a quote in April 2021, as well as its Customer

---

[1] Because Owl has moved for summary judgment, the Court must view the evidence in the light most favorable to KPaul, the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in its favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The facts are set forth with this standard in mind.

Signature Form, Terms and Conditions, Software End User License Agreement, and Technical Services Policy. *Id*. at 4-29. The quote included the following provision: "All Purchase Orders shall be subject to Seller's acceptance and to the terms and conditions attached hereto and made a part of this quotation." *Id*. at 30.

Two months later, KPaul learned that its proposal for the Army contract had been successful, and the government would be awarding KPaul $1,338,681.69 for the project. *See* ECF No. 26-2. Soon after that announcement, Jeff Dutoit, the sales executive at Owl who had prepared and sent the quote in April, emailed KPaul twice more about moving forward with the deal. ECF No. 26-5 at 5.

Ilicia Rodriguez, then a deputy program manager and purchaser at KPaul, was the listed "Contractor Point of Contact" for the Army contract. ECF No. 26-2 at 18. She was responsible for procuring the necessary hardware, software, and technical support. ECF No. 28-2 ¶ 3. In June 2021, she sent Mr. Dutoit a one-page purchase order on behalf of KPaul for the products at issue (XDE Diode Concentrator hardware and services), totaling $1,331,998.02, *see* ECF No. 26-3, with the following message: "Attached is our PO. If anything else is needed from me, please do not hesitate to contact me. Thank you for your help." ECF No. 26-5 at 4.[2] He responded a few hours later, again sending the Customer Signature Form, Terms and Conditions, Software End User License Agreement, and Technical Services Policy, and asking for the signed return of the Customer Signature Form. *See id.*

The Customer Signature Form provided, in relevant part, the following:

---

[2] The purchase order, which also included hardware and software maintenance services, was for "27 XDE Diode Concentrator units with 4 Diode Bricks (Mfg # ATSO-XDE-DBRK4)" and "9 XDE Diode Concentrator units for one-way data transfer into Defensive Cyber Operations centers (Mfg # XDESE-DBRK-OWT-4DB-LOQ)." ECF No. 26-3 at 2.

> By signing below, Owl and Customer each acknowledge and agree that they: (1) have received, read and understand the Contract Documents identified above in Table 2, including any documents incorporated by reference therein (collectively, the "Contract Documents") and (2) agree to be bound by the terms of all such documents.
>
> Each individual signatory below represents and warrants that he or she has full power and authority to execute this Form on behalf of the respective party below and to bind such party to all the Contract Documents as described above.

ECF No. 26-5 at 8. The "Contract Documents" in Table 2 of the Customer Signature Form referred to Owl's Terms and Conditions Statement, Software End User License Agreement, Technical Services Policy, and the quote sent to KPaul in April. *See id*.

Section 4 of the Terms and Conditions Statement was labeled "Financial Terms," and provided as follows:

> Payment shall be made in full in U.S. dollars within thirty (30) days from Seller's invoice date, without set-off, counterclaim or withholding of any kind (save where and to the extent that this cannot by law be excluded).
> . . .
> Without prejudice to Seller's other rights, Seller reserves the right to: charge simple interest on any overdue sums at 1.5% per month during the period of delay.

ECF No. 26-4 at 16-17.

In a short email exchange, Mr. Dutoit responded to Ms. Rodriguez's inquiries as to how to complete the form and where to sign it. *See* ECF No. 26-5 at 2-4. She executed the Customer Signature Form listing herself as "Purchaser," *see* ECF No. 26-6 at 2, and returned it later that day. *See* ECF No. 26-5 at 2. Another Owl representative countersigned the document the following week. *See* ECF No. 26-6 at 2.

Owl claims that its first shipment under the parties' contract, for which KPaul paid $90,207.78, was delivered on January 13, 2022. ECF No. 1 ¶¶ 15, 16; ECF No. 9 ¶ 16. But there were delays in shipping the remaining products. One interruption, according to Owl, was

attributable to pandemic-related supply chain problems. ECF No. 26-11 at 3; ECF No. 26-12 at 6. Securing approval from the National Security Agency ("NSA"), a prerequisite to shipping certain of the products, also affected the delivery schedule. ECF Nos. 26-12 at 7; 28-3 at 22. ECF No. 1 ¶ 18; ECF No. 9 ¶ 18. But the units were eventually added to the NSA's "Approved Diode List" in February 2023 as requested, ECF No. 1 ¶¶ 17-18; ECF No. 9 ¶¶ 17-18, and at KPaul's instruction, Owl completed shipment to the Army of all of the products that KPaul had ordered. ECF No. 1 ¶ 20-21; ECF No. 9 ¶ 20-21.

A few days after the final delivery, Owl sent an invoice to KPaul, dated March 20, 2023, for the balance remaining under the parties' agreement, $1,241,790.24, with payment due on April 19, 2023. ECF No. 26-7 at 2. KPaul, for its part, was paid in full by the Army for the completed project. ECF No. 26-8 at 5. But KPaul did not pay the balance it owed to Owl. KPaul responded to Owl's subsequent payment inquiries and meeting requests with repeated assurances that the outstanding balance would be satisfied. *See, e.g.*, ECF No. 26-9 at 2-5. But the partial payments from KPaul were sporadic, and Owl's monthly invoices often went ignored entirely. ECF No. 1 ¶ 23; ECF No. 9 ¶ 23; ECF No. 26-10 at 5 (Plaintiff's Ex. A). Owl claims that, as of March 2024, KPaul had made payments totaling only $212,478, and still owes $1,221,809.61 for the products and services rendered. ECF No. 26-10 at 2-3, 5.

## PROCEDURAL HISTORY

In August 2023, Owl sued KPaul, seeking the unpaid balance under the parties' agreement, plus interest and attorneys' fees. *See* ECF No. 1. Discovery closed in February 2024. *See* ECF No. 8. In March 2024, Owl filed the pending motion for summary judgment, along with

its accompanying exhibits, ECF No. 26-1 to 26-13. KPaul opposed the motion, and Owl filed a reply brief in April 2024.

## SUMMARY JUDGMENT STANDARD

A party may move for summary judgment on a "claim or defense—or the part of [any] claim or defense"—by showing that "there is no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The inquiry on a motion for summary judgment, in essence, is whether there is a legitimate disagreement over a controlling issue that "may reasonably be resolved in favor of either party." *Id*. at 250.

As noted above, the Court must consider the facts and all reasonable inferences in the light most favorable to the party opposing the summary judgment motion (here, KPaul). *Scott*, 550 U.S. at 378. The moving party (here, Owl) bears the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H Kress & Co*., 398 U.S. 144, 157 (1970). Once this burden is satisfied, the opposing party cannot prevail without identifying specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). Neither "[u]nsupported speculation," *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987), nor evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, will suffice.

## DISCUSSION

Owl's motion presents three questions: (1) whether KPaul's purchasing agent, Ms. Rodriguez, had authority (actual and/or apparent) to bind KPaul to the relevant contractual

documents; (2) whether there was a meeting of the minds between the parties about the relevant contractual terms; and (3) whether, if liability has been shown, Owl is entitled to not only the invoiced amount (minus amounts paid) but also prejudgment interest and/or attorneys' fees.

A.  **Apparent Authority**

KPaul concedes that Owl "shipped goods for the benefit of [KPaul] and that [Owl] has not been fully paid." Opp. at 1. But KPaul insists that the amount due to Owl is a disputed issue of fact because Ms. Rodriguez lacked the authority to bind KPaul to the terms set forth in the parties' contract as proffered by Owl, specifically, the Terms and Conditions Statement. *Id*.

Courts in Maryland observe traditional principles of agency law. *See, e.g.*, *Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 26–27 (2005); *Green v. H & R Block, Inc.*, 355 Md. 488, 503 (1999); *Bowser v. Resh*, 170 Md. App. 614, 632–33 (2006).[3] "Under the equitable doctrine of apparent authority, a principal will be bound by the acts of a person purporting to act for [the principal] when 'the words or conduct of the principal cause the third party to believe that the principal consents to or has authorized the conduct of the agent.'" *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 566 (2008) (quoting *Johns Hopkins Univ. v. Ritter*, 114 Md. App. 77, 96 (1996)). A principal is liable for the acts of its agent "in all cases where the agent is acting within the scope of [the agent's] usual employment, or is held out to the public, or to the other party, as having competent authority." *Parker v. Junior Press Printing Serv., Inc.*, 266 Md. 721, 728 (1972) (quoting *Lister v. Allen*, 31 Md. 543 (1869)).

KPaul was established in 2006 by Kevin Paul, the sole member and manager of the company. *See* ECF No. 28-1. Its operating agreement provides that "[n]o action may be taken by

---

[3] There is no dispute that Maryland law applies to the parties' dispute. *See, e.g.*, Mot. at 8; Opp. at 5-8.

the Company without the Approval of the Members or their designated agent as the Members may direct." *Id*. at 10, ¶ 4.1. Mr. Paul's day-to-day responsibilities at KPaul, however, are generally "high level." ECF No. 30-2 at 4. Routine duties of the business, such as making purchases from established vendors and executing purchase agreements, are delegated to subordinate employees. *Id*. at 4-5.

Relying on the terms of its operating agreement, ECF No. 28-1 at 5-13, KPaul denies Ms. Rodriguez had authority to sign Owl's Customer Signature form, *see id.* at 3 ¶ 7, and contends that Owl "took absolutely no steps to verify Ms. Rodriguez's ability to bind [KPaul]." Opp. at 7. But the undisputed evidence in the record establishes that, at minimum, Ms. Rodriguez had apparent authority to bind KPaul to the terms set forth in the contractual documents at issue, and that no further diligence was needed for Owl to reasonably conclude that Ms. Rodriguez was acting within the scope of her authority.

It is undisputed that she was the designated "Contractor Point of Contact" for KPaul's Army contract, and her name appears under that title on KPaul's proposal. *See e.g.*, ECF No. 26-2 at 18. The uncontested evidence reflects that signing vendor documents was a routine function of Ms. Rodriguez's employment. *See e.g.*, ECF No. 30-1 at 4 ¶¶ 12-16; ECF No. 30-4 at 4 ¶¶ 7-9. For example, she undisputedly had authority to execute purchase orders, *see* ECF No. 30-3 at 3 ¶¶ 5, 6, which can be binding agreements. *See e.g.*, *Aura Light US Inc. v. LTF Int'l LLC*, No. CV-GLR-15-3198, 2018 WL 1378802, at *5 (D. Md. Mar. 19, 2018). As deputy program manager and purchaser for KPaul, she was responsible for obtaining the necessary products and services to complete the Army contract. *See e.g.*, ECF No. 28-2 ¶¶ 2, 3. To this end, she negotiated with Owl's sales executive, Mr. Dutoit, via her KPaul email account. *See id.* ¶¶ 2-4, 12.

Although Ms. Rodriguez sought Mr. Dutoit's guidance to complete the Customer Signature Form, *see* ECF No. 26-5 at 2-4, and signed it as "Purchaser," there is no evidence in the record from which Owl would have had any basis to doubt her authority. *See* ECF No. 26-6 at 2. Her signature finalized a purchase that KPaul was undisputedly anticipating, having placed a bid on the Army contract several weeks earlier. *See, e.g.*, ECF No. 26-2. The quote that Mr. Dutoit sent KPaul referred to the Terms and Conditions Statement and he had included it as an attachment. *See* ECF No. 26-1 at 2-3, 30. And under the terms of the Customer Signature Form, Ms. Rodriguez represented her "full power and authority" to execute that document by signing it. *See* ECF No. 26-5 at 8. It was therefore reasonable for Owl to believe, without further inquiry, that Ms. Rodriguez was acting within her authority by executing the Customer Signature Form. *See e.g., Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 626 F. Supp. 2d 537, 548 (D. Md. 2009), *aff'd*, 388 F. App'x 362 (4th Cir. 2010) (finding apparent authority based in part on the principal regularly permitting its agent "to act for the corporation in executing agreements" and the third party's "multiple interactions" with the agent).

The undisputed record also establishes that, although KPaul had ample opportunities to contemporaneously intervene to cancel the contract with Owl, and although KPaul now suggests that Ms. Rodriguez did not have actual or apparent authority to bind KPaul to the contract, KPaul in fact acquiesced to the execution of the Customer Signature Form, and never suggested Ms. Rodriguez lacked its permission to finalize the deal with Owl. *See Homa v. Friendly Mobile Manor, Inc.*, 93 Md. App. 337, 363 (1992) ("Apparent authority may be implied where the principal passively permits the agent to appear to a third person to have authority to act on his behalf.") (citing 3 Am. Jur.2d Agency § 79); *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md. App. 431, 441 (1986) ("the principal becomes responsible for the agent's actions when the principal's

conduct . . . or *failure to take corrective steps*, has clothed an agent with apparent authority and thereby induces a third party to rely to his [or her] detriment.") (emphasis added); *see, e.g.*, ECF No. 26-5 at 2-4 (email correspondence between Mr. Dutoit and Kenny Lewis for Owl, and Ms. Rodriguez and Hardeen Singh for KPaul).

Nor did KPaul, in the weeks and months that followed the parties' execution of the contractual documents, ever give any indication that it did not consider itself bound by Ms. Rodriguez's execution of the Customer Signature Form. Amid Owl's shipment delays, for example—which allegedly were caused by supply chain problems and data diode testing requirements, *see, e.g.*, ECF Nos. 26-11 at 3; 26-12 at 7—KPaul did not dispute the existence of an enforceable agreement or challenge the validity of any provisions in its contract with Owl, including those stipulated in the Terms and Conditions Statement. Rather, KPaul instructed Owl to proceed with delivery once the units became available and had been added to the "Approved Diode List." *See, e.g.*, ECF No. 1 ¶ 20; ECF No. 9 ¶ 20. Nor did KPaul protest the extent of its contractual obligations as Owl sent invoices and tried to meet with KPaul about payment. *See, e.g.*, ECF No. 26-7 at 2; ECF No. 26-9 at 2. Instead, KPaul made partial payments to Owl with repeated promises to settle the balance later. *See, e.g.*, ECF No. 26-9 at 2-5.

The undisputed evidence establishes that Owl's belief that KPaul authorized Ms. Rodriguez's actions was reasonable under the circumstances. The Court does not reach whether Ms. Rodriguez had *actual* authority under KPaul's operating documents to sign the contracts with Owl (although even KPaul admitted, through Ms. Rodriguez testifying as its Rule 30(b)(6) corporate representative, that she "had the authority to sign" contractual documents including "Terms and Conditions or other documents from vendors," *see* ECF No. 30-1 at 4). That is because regardless of whether she had actual authority to bind KPaul to Owl's Terms and

Conditions, the undisputed evidence establishes that she had *apparent* authority to bind KPaul to an enforceable contract with Owl, including the Terms and Conditions Statement and its provisions concerning damages, discussed below. KPaul therefore cannot defeat Owl's motion for summary judgment on the ground that Ms. Rodriguez acted without authority.

**B.     Meeting of the Minds**

In opposing Owl's motion for summary judgment, KPaul next argues that even if Ms. Rodriguez had *authority* to bind Owl to contractual terms, there are genuine disputes of material fact over whether the parties reached a meeting of the minds sufficient to bind KPaul to the terms set forth in the Customer Signature Form and the "Contract Documents" incorporated by reference therein (*i.e.*, Owl's Terms and Conditions, Software End User License Agreement, Technical Services Policy, and the April 2021 quote). Specifically, KPaul argues that even if it is liable for the invoiced amount, it is not liable for interest, or attorneys' fees, both of which Owl contends it is entitled to as a matter of contract.

For a contract to be enforceable, "the minds of the parties must be in agreement as to its terms." *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 140 Md. App. 102, 117 (2001) (quoting *Safeway Stores, Inc. v. Altman*, 296 Md. 486, 489 (1983)). Uncertainty as to whether the parties agreed on an essential term "may indicate that the mutual assent required to make a contract is lacking." *Cochran v. Norkunas*, 398 Md. 1, 14 (2007). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Id.*

In determining whether parties intended to be bound by a contract, "the primary source for identifying this intent is the language of the contract itself." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005). "The purpose of contract interpretation is to determine and effectuate the intent of the parties." *Id.* In Maryland, "the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234-35 (4th Cir. 2007) (quoting *Gresham,* 404 F.3d at 260). If the language of a contract is unambiguous, courts "do not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran*, 398 Md. at 16. Indeed, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean." *Board of Trustees of State Colleges v. Sherman*, 280 Md. 373, 380 (1977). "[T]he true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). Once a court "properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *Washington Metro.*, 476 F.3d at 235 (quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993).

KPaul's assertion that Owl "took absolutely no efforts," Opp. at 8, to ensure Ms. Rodriguez assented to the proffered parties' agreement is belied by the record. Ms. Rodriguez acknowledged receiving and signing the Customer Signature Form. *See* ECF No. 30-4 at 4-5. And by its plain language, her signature constituted (1) confirmation of receipt, knowledge, and understanding of the parties' entire agreement, including any provisions incorporated by

reference, and (2) an intent to be bound to its terms. ECF 26-5 at 8. KPaul has not alleged incapacity, and Ms. Rodriguez is presumed to have read and understood the form before signing and returning it. *See Binder v. Benson*, 225 Md. 456, 461 (1961) ("[O]ne who has the capacity to understand a written document who reads and signs it, or, without reading it or having it read to him [or her], signs it, is bound by his [or her] signature as to all of its terms.").

KPaul contends that when Owl sent Ms. Rodriguez the Customer Signature Form, Terms and Conditions, Software End User License Agreement, and Technical Services Policy in June 2021, KPaul "never explained their terms to Ms. Rodriguez, never asked that they be initialed, did not receive them with the signed Customer Service Form," and "did not even verify that Ms. Rodriguez had even seen them." Opp. at 8 (relying on *Graves v. Spinner*, No. 2470, 2018 WL 1500303 (Md. Ct. Spec. App. Mar. 27, 2018)). But this evidence, without more, does not render whether the parties mutually assented to an enforceable agreement a triable issue of fact. The undisputed evidence shows that Ms. Rodriguez signed the form and returned it to Owl. That executed document is by itself sufficient to establish "a meeting of the minds" as matter of law.

The purchase order that Owl has sued to enforce, ECF No. 26-3 at 2, obligated KPaul to pay $1,241,790.24 no later than April 19, 2023. *See* ECF No. 26-7 at 2. And there is no dispute that KPaul failed to pay that amount within the agreed upon timeframe. *See e.g.*, ECF No. 26-12 at 3. KPaul's nonpayment constitutes legal breach, and Owl is entitled to recovery pursuant to the unambiguous provisions of the Terms and Conditions Statement.

**C.     Damages**

That leaves the question of the damages that Owl may collect under the parties' agreement. As previously noted, contract interpretation is a question of law for the Court. *Washington Metro.*, 476 F.3d at 234-35.

Owl contends that, under the terms of the parties' agreement, it is entitled to (1) the outstanding balance provided in the invoice dated March 20, 2023, (2) interest on the outstanding balance beginning April 20, 2023, and (3) the attorneys' fees that Owl has incurred in seeking to enforce its contractual rights, which Owl contends totals $66,913.90 as of March 17, 2024. *See* Mot. at 9-10; *see also* ECF No. 26-10 at 5 (chart compiling the invoices and payments); ECF No. 26-13 (attorney time entries and expenses as billed to Owl).

Owl bases its request for prejudgment interest on the express terms of the Terms and Conditions Statement. Under Section 4, KPaul was to make payment in full within thirty days of Owl's invoice date, and any failure to timely pay entitled Owl to "charge simple interest on any overdue sums at 1.5% per month during the period of delay." *See, e.g.*, ECF No. 26-1 at 6-7. The invoice as to which Owl has sued to collect payment was issued on March 20, 2023. ECF No. 26-7 at 2. Interest was to accrue at a rate of 1.5% per month on unpaid balances beginning on April 20, 2023. *See, e.g.*, ECF No. 26-1 at 6-7. KPaul neither contests the language of these provisions nor denies failing to pay Owl for the entirety of the shipped goods within the stipulated timeframe. *See* ECF No. 26-12 at 7 ¶¶ 8-14. Because the interest obligation for late payment is an express and unambiguous provision of the parties' contract, *see Gresham*, 404 F.3d at 260, Owl is legally due the ongoing and accumulated monthly interest at the contractual rate of 1.5 percent in addition to the unpaid principle.

In its reply brief, Owl contends that the interest rate should not be 1.5%, the contractual rate, but rather 6%, the default rate for prejudgment interest under Maryland law. *See* Reply at 9 (citing cases). Owl is correct that under Maryland law, "[p]rejudgment interest must be granted where 'the obligation to pay and the amount due' were 'certain, definite, and liquidated by a specific date prior to judgment.'" *Id.* (citing *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d

13

301, 311 (4th Cir. 2020)). But unlike in *Parkway*, and the other case Owl cites, *Roley v. Nat'l Pro. Exch., Inc.*, 474 F. Supp. 3d 708 (D. Md. 2020), here the parties have previously agreed, as a matter of contract, to a rate of interest lower than the default prejudgment rate. Thus, does the parties' contractual rate (1.5 percent) apply, or the Maryland state constitutional rate (6 percent)? Under the Maryland constitution, "[t]he Legal Rate of Interest shall be Six per cent. per annum; unless otherwise provided by the General Assembly." Md. Const. art. III, § 57. Under Maryland statute, "[e]xcept as otherwise provided by law, a person may not charge interest *in excess of* an effective rate of simple interest of 6 percent per annum on the unpaid principal balance of a loan." Md. Code Ann., Com. Law § 12-102 (emphasis added). The Maryland Supreme Court has held that "*[a]bsent a contractual stipulation* or a statute, the rate of prejudgment interest may not *exceed* the general legal rate of six percent." *Maryland Nat. Bank v. Cummins*, 322 Md. 570, 600 (1991) (emphases added).

Given that the General Assembly has expressly set 6 percent as a ceiling, not a floor, Md. Code Ann., Com. Law § 12-102, and given that the Supreme Court has expressed that a "contractual stipulation" would supersede the "legal rate of six percent," *Maryland Nat. Bank*, 322 Md. at 600, the Court concludes that the parties' contractual rate of 1.5 percent simple interest controls, accruing beginning April 19, 2023, when the invoice payments at issue were due.[4]

---

[4] This is different than the standard under, for example, Virginia law, which sets a floor of 6 percent for prejudgment interest. *See* Va. Code Ann. § 6.2-302 ("The judgment rate of interest shall be an annual rate of six percent, except that a money judgment entered in an action arising from a contract shall carry interest at the rate lawfully charged on such contract, or at six percent annually, *whichever is higher*.") (emphasis added). Here, however, there is no dispute that Maryland law controls.

Turning to Owl's claim for attorneys' fees and costs, however, the Court concludes that nothing in the parties' agreement permits recovery for such expenses under the circumstances. Owl insists that following provision, under Section 6.f. of its Terms and Conditions Statement, instructs otherwise:

> Customer, or End User if an End User is identified in connection with the Order, shall indemnify and hold harmless Seller, its Affiliates and their managers, officers, members, employees, and agents, from any loss, liability, damage, or expenses (including reasonable attorneys' fees) arising from the possession, use or operation of the Goods or software sold hereunder, by Customer, End User or their employees, contractors, representatives, or agents.

ECF No. 26-1 at 8. The Court does not agree.

Contractual fee-shifting provisions "must be strictly construed to avoid inferring duties that the parties did not intend to create." *Bainbridge St. Elmo Bethesda Apartments, LLC v. White Flint Express Realty Grp. Ltd. P'ship, LLLP*, 454 Md. 475, 488 (2017) (internal marks and citation omitted). Here, the parties' agreement does not contain an express fee-shifting provision. And, strictly construed, the language of the contract that Owl highlights does not qualify. It is not a fee-shifting provision, but rather is a standard indemnification clause; the parties have consented to indemnify each other, including for attorneys' fees, in the event either of them is sued by a *third* party for matters relating to the contract. That is not the scenario here—a claim for contract enforcement by one contracting party against the other. *See Nova Rsch., Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 458 (2008) ("The contract in the case before us does not explicitly cover expenses in the enforcement of the contract; therefore, we shall not imply the recovery of attorney's fees accrued in a first party action establishing the right to indemnity."). Accordingly, Owl is not entitled attorneys' fees for KPaul's nonperformance as a matter of law.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 26) is granted in part and denied in part. It is granted as to liability and Plaintiff's request for judgment for (a) the principal amount remaining due, and (b) interest at the contractual rate of 1.5% simple interest per month through the date of judgment minus amounts KPaul has paid that Owl has already credited toward interest.[5] Plaintiffs' request for attorneys' fees is denied.

A separate order follows.

Date:   September 11, 2024              _____/s/_____
                                        Adam B. Abelson
                                        United States Magistrate Judge

---

[5] As noted in the order, within seven days Plaintiff shall file a proposed judgment with the dollar figures comprising those amounts.